JAMES CONN, Individually and On
Behalf of All Others Similarly Situated,

        Plaintiff,

    vs.

MERRILL LYNCH & CO., INC.,
E. STANLEY O'NEAL,
JEFFREY N. EDWARDS,
LAWRENCE A. TOSI,
ARMANDO M. CODINA,
VIRGIS W. COLBERT,
ALBERTO CRIBIORE,
JOHN D. FINNEGAN,
JUDITH MAYHEW JONAS,
AULANA L. PETERS,
JOSEPH W. PRUEHER,
ANN N. REESE, and
CHARLES O. ROSSOTTI,

        Defendants.

**Civil Action No.** 07 CV 11626

**CLASS ACTION COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES
LAWS**

**JURY TRIAL DEMANDED**

**ECF CASE**



RECEIVED
DEC 2 8 2007
U.S.D.C. S.D.N.Y.
CASHIERS

    Plaintiff James Conn ("Conn"), on behalf of himself and all other persons similarly situated,
by his undersigned attorneys, alleges upon personal knowledge as to himself and his own acts, and
information and belief as to all other matters, based upon an investigation conducted by his
attorneys, which included, *inter alia*, review and analysis of United States Securities and Exchange
Commission ("SEC") filings by Merrill Lynch & Co., Inc. ("Merrill Lynch" or the "Company"),
press releases, research notes, transcripts of conference calls, news articles, prospectuses for
structured finance transactions underwritten by Merrill Lynch, and other information, as follows:

**I.**

## SUMMARY OF ACTION

1.      The Plaintiff brings this action as a class action, on behalf of himself and all others (except certain excluded persons, defined below), who exchanged securities of First Republic Bank ("First Republic") for securities of Merrill Lynch in connection with the Merger as described below.

2.      First Republic, founded in San Francisco in 1985, operated as one of the most successful private banks in the United States. First Republic achieved profitability in its first year of operation and, within five years, became California's largest private bank. By 2007, First Republic was trading on the NYSE, and had expanded into New York, Massachusetts, Connecticut, Oregon, Nevada, and Washington, with record deposits of $8.9 billion, and loan volume of $5.0 billion, and net earnings of $61.7 million.

3.      First Republic shareholders – a substantial percentage of which were bank employees and customers – benefited from the bank's financial strength, efficient operations and profitability, enjoying consistent earnings per share.

4.      In late 2006 and early 2007, Merrill Lynch approached First Republic bank about a possible merger. On January 29, 2007, after a period of negotiations, Merrill Lynch announced that it had reached an agreement to acquire First Republic, subject to shareholder approval, for a total transaction value of $1.8 billion. Under the agreement, First Republic shareholders would receive, at their election, cash or Merrill Lynch common stock having a value equal to $55.00 for each share of First Republic common stock owned at the completion of the Merger. The aggregate consideration would be paid with 50% cash and 50% Merrill Lynch common stock.

5.      To obtain approval from First Republic's shareholders, Merrill Lynch filed the Registration Statement dated May 8, 2007, as amended on June 8, 2007 and June 21, 2007 (the

"Registration Statement"), which became effective on June 22, 2007, and the Proxy Statement and Prospectus dated June 22, 2007 (the "Proxy/Prospectus").

6.      Unfortunately, the Registration Statement and Proxy/Prospectus were materially false and misleading because, *inter alia*, they:

> a.  failed to disclose and hid the fact that Merrill Lynch was overexposed to risky subprime loans, to the sum of billions of dollars;
>
> b.  failed to disclose and hid the fact that Merrill Lynch had begun to accumulate a massive directional position in one of the riskiest types of collateralized debt obligations ("CDOs"), ABS [asset-backed securities] CDOs;
>
> c.  failed to disclose the risks of these CDOs, including the belief of Merrill Lynch's own credit analysts that ABS CDOs were structurally deficient and would suffer in price as the underlying collateral deteriorated; and
>
> d.  failed to disclose and hid the fact that Merrill Lynch did not properly value the CDO positions on its balance sheet.

7.      In a July 17, 2007 conference call, Merrill Lynch and Defendant Edwards made further false oral communications regarding Merrill Lynch's risk management, the performance of its CDO positions, and the propriety of the valuations it ascribed to these instruments.

8.      After receiving approval from the First Republic shareholders, the Merger was completed on September 21, 2007.   However, just *weeks* after the Merger was completed, and contrary to the representations in the Registration Statement and Proxy/Prospectus, and the oral communications made in the conference call of July 17, 2007, Merrill Lynch's true exposure to subprime loans and CDOs began to emerge.

3

9.      On October 24, 2007, before the market opened, Defendants issued a press release acknowledging that Merrill Lynch's third quarter writedown for CDO and subprime lending losses had ballooned to $7.9 billion. This writedown wiped out all of Merrill Lynch's earnings for 2006. In prepared remarks during a conference call that day, Defendant O'Neal admitted for the first time that Merrill Lynch was "overexposed to sub-prime" and that its previously-touted hedging measures were "not sufficiently aggressive." In response to an analyst's question, Defendant O'Neal admitted that Merrill Lynch's staggering exposure was due to errors in risk management. These crucial facts were not even mentioned in the Registration Statement or Proxy/Prospectus.

10.      On November 2, 2007, THE WALL STREET JOURNAL ran an article indicating that Merrill Lynch's exposure to CDOs was even greater than Defendants had acknowledged, noting that Merrill Lynch would likely take an additional $4 billion in writedowns in the fourth quarter related to its CDO portfolio. The article also stated that the SEC had started an informal inquiry into how the company had marked its mortgage securities and whether it had lied to investors regarding the size of its positions. That same day, Deutsche Bank AG analyst Michael Mayo issued a research note stating that Merrill Lynch may have to take an additional $10 billion in writedowns related to its CDO and subprime exposure.

11.      The news was devastating to First Republic's former shareholders, who had just exchanged their valuable shares for Merrill Lynch stock. Based on the September 21, 2007 closing date, Merrill Lynch stock was trading at approximately $75.00 per share. Thus, First Republic shareholders received approximately 0.7332 shares of Merrill Lynch stock for each share of First Republic stock. However, by November 2, 2007, after Merrill Lynch's massive CDO exposure had been revealed, the Merrill Lynch shares obtained through the Merger had plummeted to $57.28, a 23% drop, and are presently trading at less than $55.00 per share.

4

## JURISDICTION AND VENUE

12.     The claims alleged herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§77 (k), 77(l)(a)(2) and 77(o).

13.     This Court has jurisdiction over the subject matter of this action pursuant to  Section 22 of the Securities Act, 15 U.S.C. §77v, and 28 U.S.C. §§ 1331 and 1337.

14.     Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. §1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination to the investing public of false and misleading information, occurred in part in this District.  In addition, Merrill Lynch maintains corporate headquarters in this District.

15.     In connection with the acts, transactions and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of the national securities exchanges.

### III.

## THE PARTIES

16.     As set forth in the Certification annexed hereto as Exhibit A, Plaintiff Conn exchanged 30,871 shares of First Republic common stock for 22,634 shares of Merrill Lynch stock, and exchanged an additional 5,150 shares of First Republic restricted common stock for cash and 1,068 shares of Merrill Lynch stock.  Thus, Plaintiff Conn received a total of 23,702 shares of Merrill Lynch common stock on September 21, 2007 pursuant to the Registration Statement and Proxy/Prospectus, and was damaged as a result of defendants' misconduct. Plaintiff Conn disposed of the Merrill Lynch shares acquired in the Merger as follows:

| Date | Shares sold | Proceeds |
|------|-------------|----------|
| 12/03/07 | 5,000 | $ 296,510.00 |
| 12/06/07 | 15,000 | $ 900,000.00 |
| 12/10/07 | 3,702 | $ 231,653.02 |
| **Total** | **23,702** | **$1,428,163.02** |

17. Merrill Lynch is a Delaware corporation with its principal place of business at 4 World Financial Center, New York, New York. Together with its subsidiaries, Merrill Lynch provides broker-dealer, investment banking, financing, wealth management, advisory, asset management, insurance, lending, and related products and services worldwide.

18. E. Stanley O'Neal ("O'Neal") was the Chief Executive Officer and a director of Merrill Lynch at the time the false and misleading Registration Statement and Proxy/Prospectus were filed, and remained in those positions at all relevant times until he was forced to resign on October 30, 2007. Defendant O'Neal signed the Registration Statement, by his attorney-in-fact Jeffrey N. Edwards.

19. Jeffrey N. Edwards ("Edwards") was the Chief Financial Officer and a Senior Vice President of Merrill Lynch at the time the false and misleading Registration Statement and Proxy/Prospectus were filed, and at all other relevant times. Defendant Edwards signed the Registration Statement. Defendant Edwards also served as the attorney-in-fact for the other individual defendants and signed the Registration Statement on their behalf.

20. Laurence A. Tosi ("Tosi") was the Finance Director and a Senior Vice President of Merrill Lynch at the time the false and misleading Registration Statement and Proxy/Prospectus were filed, and at all other relevant times. Defendant Tosi was designated in the Registration Statement as the Chief Accounting Officer, and consented to this designation. Defendant Tosi signed the Registration Statement, by his attorney-in-fact Jeffrey N. Edwards.

21. By reason of their executive positions, Defendants O'Neal, Edwards and Tosi were controlling persons of Merrill Lynch.

22. Armando M. Codina ("Codina") was a director of Merrill Lynch at the time the false and misleading Registration Statement and Proxy/Prospectus were filed, and at all other relevant times. Defendant Codina signed the Registration Statement, by his attorney-in-fact Jeffrey N. Edwards.

23. Virgis W. Colbert ("Colbert") was a director of Merrill Lynch at the time the false and misleading Registration Statement and Proxy/Prospectus were filed, and at all other relevant times. Defendant Colbert signed the Registration Statement, by his attorney-in-fact Jeffrey N. Edwards.

24. Alberto Cribiore ("Cribiore") was a director of Merrill Lynch and a member of the board's Finance Committee at the time the false and misleading Registration Statement and Proxy/Prospectus were filed, and at all other relevant times. Defendant Cribiore signed the Registration Statement, by his attorney-in-fact Jeffrey N. Edwards.

25. John D. Finnegan ("Finnegan") was a director of Merrill Lynch and a member of the board's Finance Committee at the time the false and misleading Registration Statement and Proxy/Prospectus were filed, and at all other relevant times. Defendant Finnegan signed the Registration Statement, by his attorney-in-fact Jeffrey N. Edwards.

26. Judith Mayhew Jonas ("Jonas") was a director of Merrill Lynch and a member of the board's Audit Committee at the time the false and misleading Registration Statement and Proxy/Prospectus were filed, and at all other relevant times. Defendant Mayhew signed the Registration Statement, by her attorney-in-fact Jeffrey N. Edwards.

27. Aulana L. Peters ("Peters") was a director of Merrill Lynch at the time the false and misleading Registration Statement and Proxy/Prospectus were filed, and at all other relevant times. Defendant Peters signed the Registration Statement, by her attorney-in-fact Jeffrey N. Edwards.

28. Joseph W. Prueher ("Prueher") was a director of Merrill Lynch and a member of the board's Audit Committee at the time the false and misleading Registration Statement and Proxy/Prospectus were filed, and at all other relevant times. Defendant Prueher signed the Registration Statement, by his attorney-in-fact Jeffrey N. Edwards.

29. Ann N. Reese ("Reese") was a director of Merrill Lynch and a member of the board's Audit and Finance Committees at the time the false and misleading Registration Statement and Proxy/Prospectus were filed, and at all other relevant times. Defendant Reese signed the Registration Statement, by her attorney-in-fact Jeffrey N. Edwards.

30. Charles O. Rossotti ("Rossotti") was a director of Merrill Lynch and a member of the board's Audit and Finance Committees at the time the false and misleading Registration Statement and Proxy/Prospectus were filed, and at all other relevant times. Defendant Rossotti signed the Registration Statement, by his attorney-in-fact Jeffrey N. Edwards.

31. As members of the Audit Committee of Merrill Lynch's board of directors, according to the Form DEF 14A that Merrill Lynch filed on April 27, 2007, Defendants Jonas, Prueher, Reese and Rossotti were charged with and responsible for:

> a. reviewing and discussing consolidated financial statements with management and the firm's accountants;
>
> b. reviewing and discussing with the firm's accountants the critical accounting policies applicable to the firm and its businesses;
>
> c. reviewing earnings press releases and other material financial information;
>
> d. considering the adequacy of internal controls;
>
> e. overseeing management's policies and processes for managing the major categories of risk affecting Merrill Lynch; and

8

f. overseeing the firm's compliance function and the adequacy of its procedures for compliance with internal policies, and legal and regulatory requirements.

32. As members of the Finance Committee of Merrill Lynch's board of directors, according to the Form DEF 14A that Merrill Lynch filed on April 27, 2007, Defendants Cribiore, Finnegan, Reese and Rossotti were charged with and responsible for:

a. reviewing and approving material acquisitions;

b. overseeing Merrill Lynch's balance sheet and capital management, including categories of assets and liabilities and commitment levels and measures of capital adequacy; and

c. reviewing Merrill Lynch's policies and procedures for managing exposure to market and credit risk and, when appropriate, reviewing significant risk exposures and trends in these categories of risk

33. By reason of their directorship of Merrill Lynch, and to the extent specified above, additional authority as members of the Audit and/or Finance Committees, Defendants Codina, Colbert, Cribiore, Finnegan, Jonas, O'Neal, Peters, Prueher, Reese, and Rossotti were controlling persons of Merrill Lynch.

34. Defendants O'Neal, Edwards, Tosi, Codina, Colbert, Cribiore, Finnegan, Jonas, O'Neal, Peters, Prueher, Reese, and Rossotti shall hereafter be referenced collectively as the "Individual Defendants."

## IV.

## SUBSTANTIVE ALLEGATIONS

### A. Background of First Republic

35. First Republic was founded in San Francisco in 1985, and incorporated in Nevada. Focusing on real estate lending in the San Francisco Bay Area, First Republic achieved profitability in its first year of operation.

36.     In 1986, First Republic completed its initial public offering of common stock and, by 1987, expanded its high-quality lending services to the Los Angeles area. Its stock was then listed on the American and Pacific Stock Exchanges.

37.     In 1992, First Republic began trading on the New York Stock Exchange. By that time, the bank had expanded its branches throughout California and into Nevada, and had more than 100 employees, making it the largest private bank in California.

38.     By 1995, completing ten years of business, First Republic had developed a unique model for private banking. With a sharp focus on personalized, old-fashioned banking services, including a variety of personal and business deposit products, First Republic had achieved an extremely strong capital foundation and history of profitable performance. Repeat and referred customers represented 75% of its loan originations. Net income of \$12.5 million in 1996 exceeded the prior year by more than ten times.

39.     In 1997, First Republic surpassed \$1 billion in loan originations, leading to record earnings. It was chosen to be included in the Russell 2000 Stock Index.

40.     In 2000, First Republic had originated \$2 billion in loans, and opened a retail branch at Park Avenue in New York City. First Republic's emphasis on quality loans – delinquent assets remained at a very low 0.04% of total assets – and growing deposits resulted in steady earnings per share to First Republic shareholders.

41.     By 2006, First Republic had expanded its branches nationwide. It reported record deposit growth of \$8.9 billion, record loan volume of \$5.0 billion, and record net earnings of \$61.7 million.

**B.   Merrill Lynch Announces Merger With First Republic**

42.     On January 28, 2007, after a period of discussions, Merrill Lynch announced that it would merge with and acquire First Republic for approximately $1.8 billion in cash and stock.

43.     On May 8, 2007, Merrill Lynch filed a Registration Statement with the SEC on Form S-4 for shares to be issued pursuant to the Merger. All of the Individual Defendants signed the Form S-4, either individually or by an appointed attorney-in-fact.

44.     On June 8, 2007 and again on June 21, 2007, Merrill Lynch filed amendments to its Registration Statement with the SEC on Form S-4/A. All of the Individual Defendants signed the Form S-4/A's, either individually or by an appointed attorney-in-fact.

45.     On June 22, 2007, Merrill Lynch filed a Proxy/Prospectus for the Merger on Form 424B3. The Merger was completed on September 21, 2007.

46.     Pursuant to the Merger, holders of First Republic common stock were permitted to register their preference to receive cash or Merrill Lynch common shares in exchange for their First Republic shares. However, the merger agreement contained a pro-ration provision that ensured that Merrill Lynch would be able to fund at least 50% of the Merger using its common stock.

47.     First Republic shareholders desiring to register their preference for receiving cash consideration or stock consideration were required to mail their election form for receipt by September 14, 2007.

48.     As a result of the pro-ratio formula, those First Republic common shareholders that elected to receive cash consideration were not paid fully in cash, but instead received only $39.44 in cash and .2074 shares of Merrill Lynch common stock in exchange for every First Republic share tendered. First Republic common shareholders that elected stock consideration, or those that did

11

not register a preference, received .7332 shares of Merrill Lynch common stock in exchange for every First Republic share tendered.

49. Pursuant to the Merger, each share of First Republic 6.70% Noncumulative Perpetual Preferred Series A was exchanged for one share of Merrill Lynch 6.70% Noncumulative Perpetual Preferred Stock Series 6, and each share of First Republic 6.70% Noncumulative Perpetual Preferred Series A was exchanged for one share of Merrill Lynch 6.70% Noncumulative Perpetual Preferred Stock Series 7.

50. The Registration Statement, both as it was originally filed and as amended, and the Proxy/Prospectus, contained false and misleading representations and omitted material facts regarding two of Merrill Lynch's key businesses: subprime lending and CDOs.

51. CDOs are financial structures that purchase a portfolio of interest-bearing securities and sell notes in various tranches to investors that pay interest based upon the cash flows received from the portfolio. CDOs are generally structured so that each tranche gets paid sequentially from the most senior to the most junior.

52. The risk of a CDO tranche depends primarily upon its seniority, and the underlying collateral. Generally, super senior and senior tranches are considered less risky than mezzanine or equity tranches. Moreover, CDOs collateralized by investment grade bonds, for example, are less risky than CDOs collateralized by junk bonds.

53. The ABS CDOs that investors ultimately learned Merrill Lynch had bet heavily on were among the riskiest. ABS CDOs rely on asset-backed securities, or securitized pools of residential mortgages (often subprime) and/or home equity loans, for a large part of their collateral.

54. On October 12, 2007, THE NEW YORK TIMES ran a critical story entitled "Merrill Painfully Learns the Risks of Managing Risk," which found that Merrill Lynch actually had a "significant breakdown in risk management" with respect to its subprime loan and CDO portfolio.

55. On October 16, 2007, CNBC ran a report suggesting that Defendant Edwards would be terminated or forced to resign because of false statements he had made in the July 17, 2007 conference call regarding Merrill Lynch's risk management and CDO exposure. That same day, BLOOMBERG ran a critical story regarding Defendant O'Neal's decision to leverage exposure to subprime loans and CDOs entitled "O'Neal Deemed Subprime CEO as Mortgages Mar Merrill Earnings."

56. On October 24, 2007, before the market opened, Defendants issued a press release acknowledging that Merrill Lynch's third quarter writedown for CDO and subprime lending losses had ballooned to $7.9 billion, 75% more than it had stated only nineteen days earlier. This writedown wiped out all of Merrill Lynch's earnings for 2006.

57. In prepared remarks during a conference call that day, Defendant O'Neal admitted for the first time that Merrill Lynch was "overexposed to sub-prime" and that its previously-touted hedging measures were "not sufficiently aggressive." In response to an analyst's question, Defendant O'Neal admitted that Merrill Lynch's staggering exposure was due to errors in risk management. These crucial facts were not even mentioned in the Registration Statement or Proxy/Prospectus.

58. On November 2, 2007, THE WALL STREET JOURNAL ran an article indicating that Merrill Lynch's exposure to CDOs was even greater than Defendants had acknowledged. According to the article, Merrill Lynch would likely take an additional $4 billion in writedowns in the fourth quarter related to its CDO portfolio. The article also stated that the SEC had started an

13

informal inquiry into how the company had marked its mortgage securities and whether it had lied to investors regarding the size of its positions.

59. That same day, Deutsche Bank AG analyst Michael Mayo issued a research note stating that Merrill Lynch may have to take an additional $10 billion in writedowns related to its CDO and subprime exposure. On November 2, 2007, Merrill Lynch shares closed at $57.28, down $4.91 from the previous day and down $18.10 from October 11, 2007.

## C.   False And Misleading Statements In The Registration Statement, Proxy/Prospectus, And Oral Communications

60. The Registration Statement and Proxy/Prospectus led investors to believe that Merrill Lynch's business had not suffered any material adverse effects since Merrill Lynch signed the Merger agreement with First Republic on January 29, 2007. The Registration Statement and Proxy/Prospectus each stated that Merrill Lynch made representations and warranties to First Republic concerning its "regulatory reports, financial and other reports and material adverse effects," and assured that "representations and warranties relating to events having a materially adverse effect on First Republic or Merrill Lynch . . . must be true in all respects." They explained that the "term 'material adverse effect,' as used with respect to Merrill Lynch or First Republic, means an individual or aggregate effect that . . . has a material adverse effect on the financial condition, results of operations, assets or business of Merrill Lynch or First Republic, as the case may be, and their respective subsidiaries, taken as a whole."

61. The discussion of the "material adverse effect" provision in the Registration Statement and Proxy/Prospectus was materially misleading, because it omitted that Merrill Lynch had experienced "material adverse effects" in its subprime lending business and CDOs that compromised the firm's overall "financial condition, results of operations, assets or business," as the October 24, 2007 writedown confirmed.

14

62.     The Registration Statement and Proxy/Prospectus each indicated that Merrill Lynch earned $7.499 billion in 2006, and $2.158 billion in the first three months of 2007.  These statements were materially misleading because they omitted that: (1) the cited results were not representative of Merrill Lynch's business going forward; and (2) Merrill Lynch would take a charge right after the Merger was completed that effectively wiped out all of the 2006 earnings.  Merrill Lynch also omitted that it would be likely to take further charges in the future.

63.     The discussion of financial performance in the Registration Statement and Proxy/Prospectus was also materially misleading because it omitted that Merrill Lynch had compromised financial performance going forward by dramatically increasing its exposure to risky CDOs, and had failed to properly account for that position on its financial statements, causing in large part the $7.9 billion writedown soon after the Merger closed.

64.     According to the Company's 2006 Form 10-K annual report that Defendants incorporated by reference in the Registration Statement, at the end of 2006, Merrill Lynch retained only $6.8 billion worth of *all* securitizations into 2007, including both CDOs and municipal bond securitizations that are not at issue here:

> In certain instances, Merrill Lynch retains interests in the senior tranche, subordinated tranche, and/or residual tranche of securities issued by certain SPEs created to securitize assets.
>
> ****
>
> Retained interests in securitized assets were approximately $6.8 billion and $4.0 billion at December 29, 2006 and December 30, 2005, respectively, which related primarily to residential mortgage loan and municipal bond securitization transactions. The majority of the retained interest balance consists of mortgage-backed securities that have observable market prices. These retained interests include mortgage-backed securities that Merrill Lynch expects to sell to investors in the normal course of its underwriting activity.

These statements were materially misleading at the time they were incorporated into the final Registration Statement and Proxy/Prospectus because Merrill Lynch had since more than quadrupled its holdings in exotic CDO instruments, and shifted strategy from "expect[ing] to sell" the securities to investors "in the normal course of its underwriting activity" to making a massively leveraged directional bet on these assets.

65.    Merrill Lynch's direct statements in the Registration Statement and Proxy/Prospectus regarding its financial performance, and its incorporated statements regarding exposure to CDOs, were particularly misleading because they omitted any mention that the firm's own CDO analysts believed the outlook for ABS CDOs was dire and that the instruments were structurally deficient, or the fact that Merrill Lynch was continuing to increase its exposure to ABS CDOs.

66.    Merrill Lynch's direct statements in the Registration Statement and Proxy/Prospectus regarding its financial performance, and its incorporated statements regarding exposure to CDOs, were also materially false and misleading because Merrill Lynch's CDO positions were not properly valued until after the Merger, when Merrill Lynch acknowledged that the fair value of the instruments was actually $6.9 billion less than had previously been marked on Merrill Lynch's books.

67.    Merrill Lynch told investors in its first quarter 2007 Form 10-Q, incorporated by reference into the Registration Statement and Proxy/Prospectus, that the firm marked its CDO positions to market in the manner specified by SFAS No. 157:

> SFAS No. 157 defines fair value, establishes a framework for measuring fair value, establishes a fair value hierarchy based on the quality of inputs used to measure fair value and enhances disclosure about fair value measurements . . . . . We early adopted SFAS No. 157 in the first quarter of 2007.

SFAS No. 157 requires that where no liquid market exists, companies attempt to value assets using other observable inputs such as: quoted prices for similar assets or liabilities in other markets,

16

whether active or inactive; observable inputs, other than quoted prices, such as interest rates, yield curves, volatilities, prepayment speeds, loss severities, credit risks, and default rates; and inputs that are derived principally from or can be corroborated by market data. SFAS No. 157 was designed to prevent management from relying on inaccurate, self-serving models to value assets where better alternatives exist.

68.     Additionally, the Registration Statement and Proxy/Prospectus indicated that Merrill Lynch warranted the accuracy of its financial reporting under the Merger agreement, which includes the valuation of illiquid assets under SFAS No. 157.

69.     The direct statements in the Registration Statement and Proxy/Prospectus regarding the accuracy of financial reporting, and the incorporated statements in the first quarter 2007 10-Q regarding compliance with SFAS No. 157, were materially false and misleading because numerous observable inputs indicated that the value of ABS CDOs had deteriorated significantly during the first two quarters of 2007, requiring Merrill Lynch to write down its CDO assets to reflect their true fair value in accordance with SFAS No. 157 instead of waiting until after the Merger closed.

70.     The Registration Statement and Proxy/Prospectus each stated that First Republic obtained a fairness opinion determining that the Merger price and terms were fair based upon a comparison of Merrill Lynch's 2006 financial results with those of its peers. These statements were materially misleading because Merrill Lynch's 2006 earnings were in no way representative of the earnings that Merrill Lynch would have in 2007, including the massive writedowns taken just after the Merger closed.

71.     The Registration Statement and Proxy/Prospectus also incorporated by reference false statements made in an April 19, 2007 Form 8-K that all non-prime activity (which includes both subprime and Alt-A, loans which are ranked between subprime and prime), including

17

securitizations, accounted for less than one percent of revenues. These statements were false and misleading at the time they were incorporated into the Registration Statement and Proxy/Prospectus, because Merrill Lynch was then actually "overexposed" to subprime.

72.     On July 17, 2007, Merrill Lynch conducted a conference call discussing Merrill Lynch's second quarter 2007 performance. In the question & answer session, Defendant Edwards made several false and misleading oral communications about Merrill Lynch's risk management and the hedging and pricing of its CDO positions:

> **Glenn Schorr – UBS:** That is good enough color. Can we switch to the other one that you brought up in terms of both sub-prime and CDO exposure? You are the largest underwriter of CDOs, and maybe try to give some color around myth versus reality, and how people should think about what is on your books in terms of residuals and exposure, and maybe even comment related to some of the bear hedge funds, what collateral you have taken on your books or have not? Just overall comfort there, as well.
>
> **Jeff Edwards:** Again I want to make two points. The first is that this is another example where I think *proactive aggressive risk management has put us in exceptionally good position.* Obviously the market has gone through a period of flux. We think that remains the case. *But aggressive risk management, I think, has certainly helped transform our risk profile since the end of the year.*
>
> We have seen significant reductions in our exposure to the lower rated segments of the market. Our warehouse lines are down materially, our whole loan inventory is down materially, as was the case in the last quarter. We will see a modest increase in our residual position but it will be small relative to our overall retained interest piece. And I think the majority of our exposure continues to be now in the highest credit segment of the market.
>
> The second point I want to make before I leave the question is this is obviously an area that has received a lot of attention, and it receives a lot attention as we work to risk manage it. But it is only a part of our business, our broader business. It is a part of our structured finance and investment business, which has many other pistons around the world, other asset classes. And in turn, Structured Finance is only a part of our broader FICC business, which is obviously only a part of GMI, and a part of the firm. I think the importance of diversification came through yet again this quarter in these results.

**Glenn Schorr – UBS:** Maybe just last thing, yes or no; obviously yes, but a point of clarification. Therefore, *anything you are financing in your repo business or through your prime brokerage business or on your own books, to the best of your knowledge at the end of quarter it is marked to an effective market, even if it's a mark to model type of security*?

**Jeff Edwards:** *Yes. That is right. Obviously we have a very robust process around marking these assets. We are confident in how they are marked.*

\*\*\*\*

**Mike Mayo - Deutsche Bank:** Back to the other topic. Can you remind us what percent of your earnings are related to mortgage or sub-prime mortgage? And if you could include in that CDOs, warehouse lines, or anything else.

**Jeff Edwards:** *Well, just to remind everybody, we made the comment in the first quarter that over the previous five quarters, all of that activity as broadly as we could define it, represented less than 2%. As I said, the business overall was down compared to last year, it was up compared to the first quarter.* I don't think there is anything that would change that comment that I made in the first quarter.

73. These additional oral communications, disseminated publicly while First Republic shareholders were determining whether to tender shares into the Merger, were materially false and misleading because Merrill Lynch's risk management was actually poor, its positions were not appropriately marked, and it was actually overexposed to subprime lending, as it admitted shortly after the Merger closed.

74. On September 14, 2007, Merrill Lynch filed a Form 8-K updating the Registration Statement and Proxy/Prospectus, which stated:

> We are making the following disclosure in anticipation of the closing of Merrill Lynch's acquisition of First Republic Bank, which is scheduled for September 21, 2007.
>
> As we stated in our Quarterly Report on Form 10-Q for the quarterly period ended June 29, 2007: "While the outlook for growth in most global businesses in which we operate remains strong, the challenging market conditions in certain credit markets that existed during the first half of 2007 have intensified in the beginning of the third quarter. Characteristics of this environment include increased volatility, wider

19

credit spreads, reduced price transparency, lower levels of liquidity, and rating agency downgrades. These factors have impacted and may continue to impact the sub-prime mortgage market, including certain collateralized debt obligations (CDOs), as well as other structured credit products and components of the leveraged finance origination market. Merrill Lynch continues to be a major participant in these markets with risk exposures through cash positions, loans, derivatives and commitments. Given current market conditions, significant risk remains that could adversely impact these exposures and results of operations. We continue our disciplined risk management efforts to proactively execute market strategies to manage our overall portfolio of positions and exposures with respect to market, credit and liquidity risks."

Credit market conditions have continued to remain challenging in the third quarter, and the firm, as part of its regular accounting processes, has made requisite fair value valuation adjustments as appropriate to certain of these exposures, which are reflected in our third quarter to date results.

75.    The statements made in the September 14, 2007 Form 8-K updating the Registration Statement and Proxy/Prospectus were materially false and misleading because: (1) Merrill Lynch had not made the "appropriate adjustments" to its fair value valuation adjustments of its CDO and subprime positions, nor had it reflected such adjustments in its third quarter to date results; (2) Merrill Lynch did not disclose that appropriate adjustments would be devastating and would effectively wipe out all of its 2006 earnings; and (3) credit market conditions did not remain challenging, as Merrill Lynch stated, but rather materially worsened during the third quarter.

## V.

## CLASS ACTION ALLEGATIONS

76.    Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of:

All persons and entities who acquired Merrill Lynch securities as a result of the exchange of First Republic securities pursuant to the Registration Statement and Proxy/Prospectus, and who were damaged thereby (the "Class"). Excluded from the Class are the Individual Defendants, members of the Individual Defendants' immediate families, any entity in which

20

any defendant has a controlling interest, and the legal representatives, heirs, successors or assigns of any such excluded person.

77.     The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time, and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members of the Class who exchanged First Republic securities for Merrill Lynch securities pursuant to the Merger. According to its third quarter 2007 Form 10-Q, Merrill Lynch issued 11.6 million shares of Merrill Lynch common stock and $115 million worth of Merrill Lynch preferred stock to former First Republic shareholders in connection with the Merger.

78.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are whether: (a) defendants violated Sections 11, 12(a)(2), and/or 15 of the Securities Act, as alleged herein; (b) the Registration Statement and Proxy/Prospectus, and documents incorporated by reference therein, contained materially false and misleading statements of fact; (c) the Registration Statement and Proxy/Prospectus, and documents incorporated by reference therein, omitted material facts that were necessary in order to make the statements made not misleading; and (d) the members of the Class have sustained damages and, if so, the appropriate measure thereof.

79.     Plaintiff's claims are typical of the claims of the members of the Class, as the claims of plaintiff and the members of the Class are based on the same legal theories, and each has sustained damages as a result of defendants' wrongful conduct in violation of federal law, as complained of herein.

21

80.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

81.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for Class members individually to seek redress for the wrongs done to them. Plaintiff anticipates no difficulty in the management of this action as a class action.

## VI.

## CAUSES OF ACTION

### COUNT I

### Against Merrill Lynch For Violations
### of Section 11 of The Securities Act

82.     Plaintiff repeats and realleges the allegations in ¶¶ 1 through 81, as if fully set forth herein.

83.     This Count is asserted against Merrill Lynch for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class.

84.     The Registration Statement, as originally filed and as amended, and the Proxy/Prospectus were materially false and misleading; contained untrue statements of material facts; omitted to state material facts necessary to make the statements made in the Registration Statement and Proxy/Prospectus, under the circumstances in which they were made, not misleading; and/or failed to adequately disclose material facts. As detailed herein, the Registration Statement and Proxy Prospectus were materially false or misleading because, *inter alia*, they: (a) failed to

22

disclose that Merrill Lynch had become "overexposed" to questionable subprime mortgages; (b) understated the importance of nonprime lending activities to Merrill Lynch's operations; (c) failed to disclose that Merrill Lynch had begun to massively accumulate risky ABS CDO securities; (d) failed to disclose that its CDO strategy shifted from retaining small positions for distribution to investors to making large directional bets on the securities; (e) failed to disclose severe structural defects and collateral risks that threatened, and ultimately shattered, the value of its CDOs; and (f) misrepresented that its CDOs were adequately valued or "marked" on its financial statements, when in fact they were not reduced as required to reflect the deteriorated market value of these securities.

85.    Merrill Lynch is the registrant for the shares issued pursuant to the Merger, and filed the Registration Statement as the issuer of its common and preferred stock, as defined in Section 11(a)(5) of the Securities Act.

86.    As the issuer of such stock, Merrill Lynch is liable to Plaintiff and the members of the Class who exchanged First Republic securities for Merrill Lynch securities in connection with the Merger, and pursuant to the Registration Statement and Proxy/Prospectus.

87.    Plaintiff and members of the Class who exchanged First Republic common stock and/or preferred stock in connection with the Merger, each acquired Merrill Lynch securities issued pursuant to the Registration Statement and Proxy/Prospectus.

88.    This action was brought within one year after the discovery of the untrue statements and/or omissions and within three years after the Merrill Lynch securities were acquired in connection with the Merger.

89.    By reason of the foregoing, Merrill Lynch violated Section 11 of the Securities Act and is liable to Plaintiff and the members of the Class who exchanged First Republic common stock or securities, each of whom has been damaged by reason of such violation.

# COUNT II

## Against the Individual Defendants For Violations
## of Section 11 of the Securities Act

90.     Plaintiff repeats and realleges allegations ¶¶ 1 through 81, as if fully set forth herein.

91.     This Count is asserted against the Individual Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class.

92.     The Registration Statement, as originally filed and as amended, and the Proxy/Prospectus were materially false and misleading; contained untrue statements of material facts; omitted to state material facts necessary to make the statements made in the Registration Statement and Proxy/Prospectus, under the circumstances in which they were made, not misleading; and/or failed to adequately disclose material facts. As detailed herein, the Registration Statement and Proxy Prospectus were materially false or misleading because, *inter alia*, they: (a) failed to disclose that Merrill Lynch had become "overexposed" to questionable subprime mortgages; (b) understated the importance of nonprime lending activities to Merrill Lynch's operations; (c) failed to disclose that Merrill Lynch had begun to massively accumulate risky ABS CDO securities; (d) failed to disclose that its CDO strategy shifted from retaining small positions for distribution to investors to making large directional bets on the securities; (e) failed to disclose severe structural defects and collateral risks that threatened, and ultimately shattered, the value of its CDOs; and (f) misrepresented that its CDOs were adequately valued or "marked" on its financial statements, when in fact they were not reduced as required to reflect the deteriorated market value of these securities.

93.     The Individual Defendants were responsible for the contents of the Registration Statement and Proxy/Prospectus and caused their filing with the SEC.

24

94.     The Individual Defendants signed the Registration Statement, themselves or by their attorney-in-fact, and/or consented to being named therein as directors of Merrill Lynch.

95.     None of the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements described herein, which were contained in the Registration Statement and Proxy/Prospectus, were true, were without omission of any material facts, and/or were not misleading.

96.     Plaintiff and members of the Class who exchanged First Republic common stock and/or preferred stock in connection with the Merger, each acquired Merrill Lynch securities issued pursuant to the Registration Statement and Proxy/Prospectus.

97.     This action was brought within one year after the discovery of the untrue statements and/or omissions and within three years after the Merrill Lynch securities were acquired in connection with the Merger.

98.     By reason of the foregoing, the Individual Defendants violated Section 11 of the Securities Act and is liable to Plaintiff and the members of the Class who exchanged First Republic common stock or securities, each of whom has been damaged by reason of such violation.

## COUNT III

### Against Merrill Lynch for Violations of Section 12(a)(2) of the Securities Act Regarding the Proxy/Prospectus

99.     Plaintiff repeats and realleges allegations ¶¶ 1 through 81, as if fully set forth herein.

100.    This Count is asserted against Merrill Lynch for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 771(a)(2).

101. Merrill Lynch solicited Plaintiff and members of the Class to exchange their securities in First Republic for securities in Merrill Lynch by means of the preparation and dissemination of the Registration Statement and Proxy/Prospectus.

102. The Registration Statement, as originally filed and as amended, and the Proxy/Prospectus were materially false and misleading; contained untrue statements of material facts; omitted to state material facts necessary to make the statements made in the Registration Statement and Proxy/Prospectus, under the circumstances in which they were made, not misleading; and/or failed to adequately disclose material facts. As detailed herein, the Registration Statement and Proxy Prospectus were materially false or misleading because, *inter alia*, they: (a) failed to disclose that Merrill Lynch had become "overexposed" to questionable subprime mortgages; (b) understated the importance of nonprime lending activities to Merrill Lynch's operations; (c) failed to disclose that Merrill Lynch had begun to massively accumulate risky ABS CDO securities; (d) failed to disclose that its CDO strategy shifted from retaining small positions for distribution to investors to making large directional bets on the securities; (e) failed to disclose severe structural defects and collateral risks that threatened, and ultimately shattered, the value of its CDOs; and (f) misrepresented that its CDOs were adequately valued or "marked" on its financial statements, when in fact they were not reduced as required to reflect the deteriorated market value of these securities.

103. Merrill Lynch owed Plaintiff and the Class the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Proxy/Prospectus to ensure that such statements were true and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. Merrill Lynch, in the exercise of reasonable care by its employees and agents, should have known

of the misstatements and omissions contained in the Registration Statement and Proxy/Prospectus, as set forth above.

104. At the time they exchanged their First Republic securities for Merrill Lynch securities issued pursuant to the Registration Statement and Proxy/Prospectus, Plaintiff and members of the Class did not know, nor in the exercise of reasonable diligence could they have known, of the material misstatements and/or omissions alleged herein.

105. By reason of the conduct alleged herein, Merrill Lynch violated Section 12(a)(2) of the Securities Act.

106. As a direct and proximate result of such violations, Plaintiff and other members of the Class were harmed and hereby tender their securities for rescission or seek damages to the extent permitted by law.

## COUNT IV

### Against Merrill Lynch and Defendant Edwards for Violation of Section 12(a)(2) of the Securities Act Regarding Oral Communications

107. Plaintiff repeats and realleges allegations ¶¶ 1 through 81, as if fully set forth herein.

108. This Count is asserted against Merrill Lynch and Defendant Edwards for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 771(a)(2).

109. On July 17, 2007, Defendant Edwards, in his capacity as an agent and officer of Merrill Lynch, issued false and misleading oral communications in a conference call as a means of soliciting Plaintiff and members of the Class to exchange their securities in First Republic for securities in Merrill Lynch.

110. In that conference call, Defendant Edwards stated that: (a) with respect to CDO exposure, "proactive aggressive risk management has put us in exceptionally good position. . . . aggressive risk management, I think, has certainly helped transform our risk profile since the end of

27

the year;" (b) Merrill Lynch has "a very robust process around marking [CDO and subprime] assets. We are confident in how they are marked;" (c) with respect to CDOs, warehouse lines, and mortgages (including subprime), "all of that activity as broadly as we could define it, represented less than 2%" of Merrill Lynch's business; and (d) with respect to CDOs and other collateral held by broker-dealer customers, including Bear Stearns Asset Management, "our net exposure in the situation is both limited and well under control. We obviously have acted in ways that we think are prudent in managing our risk. . . . our exposure here is limited, it is contained and it is appropriately marked."

111. The oral communications set forth in Paragraph 110 above were materially false and misleading, contained untrue statements of material facts, omitted to state material facts necessary to make the statements, under the circumstances in which they were made, not misleading, and/or failed to adequately disclose material facts. As detailed herein, these statements were materially false or misleading because, *inter alia*, they: (a) misrepresented that Merrill Lynch's CDO portfolio was "in an exceptionally good position;" (b) misrepresented that Merrill Lynch's risk management, with respect to those positions, was effective; (c) misrepresented that Merrill Lynch had a robust system for marking its CDO assets, and had marked those positions correctly; (d) failed to disclose that Merrill Lynch had actually accumulated an overexposed position to risky subprime loans; (e) failed to disclose that Merrill Lynch had begun to massively accumulate risky ABS CDO securities; (f) failed to disclose that its CDO strategy shifted from retaining small positions for distribution to investors to making large directional bets on the securities; and (g) failed to disclose severe structural defects and collateral risks that threatened, and ultimately shattered, the value of its CDOs.

112.    Merrill Lynch and Defendant Edwards owed Plaintiff and the Class the duty to make a reasonable and diligent investigation of the oral statements Edwards made to ensure that such statements were true and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. Merrill Lynch and Defendant Edwards, in the exercise of reasonable care, should have known of the misstatements and omissions set forth above.

113.    At the time they exchanged their First Republic securities for Merrill Lynch securities issued, Plaintiff and members of the Class did not know, nor in the exercise of reasonable diligence could they have known, of the material misstatements and/or omissions alleged herein.

114.    By reason of the conduct alleged herein, Merrill Lynch and Defendant Edwards violated Section 12(a)(2)of the Securities Act.

115.    As a direct and proximate result of such violations, Plaintiff and other members of the Class were harmed and hereby tender their securities for rescission or seek damages to the extent permitted by law.

## COUNT V

### Against the Individual Defendants for Violations of
### Section 15 of the Securities Act

116.    Plaintiff repeats and realleges allegations ¶¶ 1 through 81, and ¶¶ 99 through 115, as if fully set forth herein.

117.    This Count is brought pursuant to Section 15 of the Securities Act on behalf of Plaintiff and the Class.

118.    At the time the Registration Statement and Proxy/Prospectus were filed by Merrill Lynch, each of the Individual Defendants was a controlling person of Merrill Lynch within the meaning of Section 15 of the Securities Act.

119.    Between the filing of the Registration Statement and Proxy/Prospectus with the SEC and the Merger and its dissemination to Plaintiff and other Class members, each of the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein, including the issuance of the false and misleading Registration Statement and Proxy/Prospectus.

120.    None of the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Proxy/Prospectus were true and devoid of any omissions of material facts. Therefore, by reason of their positions as control persons of Merrill Lynch, as alleged herein, each of the Individual Defendants is jointly and severally liable with, and to the same extent as, Merrill Lynch and other members of the Class as a result of the wrongful conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff James Conn, on his own behalf and on behalf of the Class, prays for judgment as follows:

A.      Declaring this action to be a proper class action and certifying Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding damages in favor of Plaintiff and the other members of the Class against all Defendants for the damages sustained as a result of Defendants' wrongdoing, together with interest thereon;

C.      Awarding Plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts; and

D. Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure Rule 38(b), Plaintiff demands a trial by jury.

Dated: December 28, 2007

<div style="margin-left:40%">

**POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP**

By: _____
    Patrick V. Dahlstrom

Stanley M. Grossman
100 Park Avenue, 26th Floor
New York, NY 10017
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

Patrick V. Dahlstrom
Joshua B. Silverman
One North LaSalle Street, Suite 2225
Chicago, IL 60602
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

**COTCHETT, PITRE & McCARTHY**

By: _____
    Joseph W. Cotchett

Joseph W. Cotchett
Mark C. Molumphy
Nancy L. Fineman
Stuart G. Gross
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

</div>

### CERTIFICATE OF JAMES CONN IN SUPPORT OF
### CLASS ACTION COMPLAINT

I, JAMES CONN, declare, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the complaint prepared by counsel in the above-captioned case and have authorized its filing.

2. I did not purchase or obtain the security that is the subject of the complaint at the direction of my counsel or in order to participate in any private action arising under the federal securities laws.

3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. In the past three years, I have not served, nor sought to serve, as a representative party on behalf of a class in an action filed under the federal securities laws.

5. I will not accept payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

6. I made the following transactions in securities that are the subject of this action: I exchanged 30,871 shares of First Republic common stock for 22,634 shares of Merrill Lynch stock, and exchanged an additional 5,150 shares of First Republic restricted common stock for cash and 1,068 shares of Merrill Lynch stock. Thus, I

received a total of 23,702 shares of Merrill Lynch common stock on September 21, 2007.

I disposed of the Merrill Lynch shares acquired in the Merger as follows:

| Date | Shares sold | Proceeds |
|------|-------------|----------|
| 12/03/07 | 5,000 | $ 296,510.00 |
| 12/06/07 | 15,000 | $ 900,000.00 |
| 12/10/07 | 3,702 | $ 231,653.02 |
| Total | 23,702 | $1,428,163.02 |

I declare under penalty of perjury that the foregoing is true and correct. Executed

this 28ᵗʰ day of December 2007.

JAMES CONN